NO. 12-02-00053-CV



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


PAUL SAMUEL GOLDBERG AND
§
 APPEAL FROM THE 115TH

PACIFIC MOTOR TRANSPORT

COMPANY d/b/a PACER,

APPELLANTS


V.
§
 JUDICIAL DISTRICT COURT OF



JAMES DICKS,

APPELLEE
§
 UPSHUR COUNTY, TEXAS

 

MEMORANDUM OPINION


 Following a jury trial, Appellants Paul Samuel Goldberg ("Goldberg") and Pacific Motor
Transport Co., d/b/a Pacer ("Pacer"), challenge an $892,372.80 final judgment rendered in favor of
James Dicks ("James"). In four issues, Goldberg and Pacer contend that the evidence is legally and
factually insufficient to support the jury's findings. We modify the judgment of the trial court, and
as modified, affirm.


Background

 On August 19, 1996, James was working for his brother, Gary Dicks ("Gary"), as a laborer
for Gary's residential construction company in Upshur County. That day, James, Gary, and other
workers installed vinyl siding on a house in Tyler. At around 4:30 p.m., the crew quit for the day,
and loaded into two pickup trucks in order to travel back to Upshur County. Gary was driving one
of the trucks and pulling a sixteen-foot flatbed trailer. The cargo bed of the truck contained empty
vinyl siding boxes, air compressors, and a large tool box. Two crew members rode with Gary in the
cab of that pickup truck, and James rode in the cargo bed on top of some folded boxes. The other
truck was driven by Nicholas Goins ("Nick").

 The two trucks traveled up Highway 271, with Gary's truck leading, and came to the
intersection of Highway 271 and Interstate 20. Both trucks were traveling in the right lane and were
following an eighteen-wheeled truck. The driver of the eighteen wheeler signaled that he was going
to make a right turn off of Highway 271, so Gary switched to the left lane in order to go around the
truck.

 As the eighteen wheeler was signaling, a second eighteen wheeler, driven by Goldberg in the
course and scope of his employment with Pacer, was stopped at the same intersection but was
adjacent to the left lane on Highway 271. Goldberg was waiting to cross to the other side of
Highway 271. Goldberg looked south on Highway 271 and saw only the eighteen wheeler that was
signaling a right-hand turn. The driver of that eighteen wheeler signaled to Goldberg to go first
through the intersection and cross Highway 271. As Goldberg took his foot off the brake and
released the clutch, he did not notice Gary's pickup truck traveling in the left northbound lane of
Highway 271. Goldberg's truck raised up at the same time that Gary was driving his truck directly
in front of Goldberg. When Goldberg's truck began to move, the middle passenger in Gary's truck,
Charles Whiteside ("Whiteside"), shouted, "It's coming out!" Gary then made a sharp turn to the
right and another sharp turn to correct his truck to the left. During these turns, James was ejected
out of the cargo bed. As a result, he suffered multiple injuries, including a broken left foot, an injury
to his shoulder, skin burns over fifteen percent of his total body surface, and complete tears of the
medial meniscus and anterior cruciate ligament in his knee.

 On May 13, 1997, James sued Goldberg, Pacer, and Gary, alleging that Goldberg negligently
operated his vehicle by 1) failing to keep a proper lookout, 2) operating his vehicle at a speed which
was excessive under the circumstances, 3) failing to properly and timely apply his brakes, and 4)
failing to yield the right of way in obedience to a traffic control device. On May 19, Gary filed his
answer, and Pacer and Goldberg filed their answers on June 30 and September 2, respectively. On
May 14, 2001, Goldberg and Pacer amended their answer, asserting affirmative defenses of
contributory negligence, unavoidable accident, sudden emergency, and failure to mitigate damages. 
 On October 8, 2001, James's case went to trial. After each side presented its evidence and
argued its case, the jury began deliberations on October 11. That same day, the jury found that
Goldberg's negligence proximately caused the accident and James's injuries. The jury also found
that James was not negligent, and attributed one hundred percent of the cause of the accident to
Goldberg. Furthermore, the jury awarded James $85,000.00 for past physical pain and mental
anguish, $200,000.00 for future physical pain and mental anguish, $42,000.00 for past lost earning
capacity, $180,000.00 for future lost earning capacity, $15,000.00 for past disfigurement, zero for
future disfigurement, $15,000.00 for past physical impairment, zero for future physical impairment,
$30,000.00 for past medical care, and $40,000.00 for future medical care. (1) This appeal followed. 

Legal and Factual Sufficiency

 On appeal, Goldberg and Pacer contend that the evidence adduced at trial is legally and
factually insufficient to support 1) the jury's failure to find any contributory negligence on the part
of James, 2) the finding that James's ejection out of the cargo bed of the truck was the foreseeable
result of any conduct by Goldberg and Pacer, 3) the finding that James will sustain any compensable
mental anguish or physical pain in the future, and 4) the jury's award of past medical expenses.

Standard of Review: Legal Sufficiency

 In reviewing a legal sufficiency or no-evidence complaint, the appellate court must consider
only the evidence and inferences tending to support the challenged findings and disregard all
evidence and inferences to the contrary. If there is more than a scintilla of evidence to support the
challenged findings, the no-evidence challenge fails. Leitch v. Hornsley, 935 S.W.2d 114, 118 (Tex.
1996). We may sustain a "no evidence" point only when the record discloses one of the following:
(1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or
evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence
offered to prove a vital fact is no more than a mere scintilla of evidence, or (4) the evidence
establishes conclusively the opposite of a vital fact. See Merrell Dow Pharms., Inc. v. Havner, 953
S.W.2d 706, 711 (Tex. 1997). It is not within our province to second guess the factfinder unless only
one inference can be drawn from the evidence. See Havner v. E-Z Mart Stores, Inc., 825 S.W.2d
456, 461 (Tex. 1992). If the evidence furnishes some reasonable basis for differing conclusions by
reasonable minds about a vital fact's existence, more than a scintilla of evidence exists. Burroughs
Wellcome v. Crye, 907 S.W.2d 497, 499 (Tex. 1995); Kindred v. Con/Chem, Inc., 650 S.W.2d 61,
63 (Tex. 1983). 

Standard of Review: Factual Sufficiency

 When conducting a factual sufficiency review, this court must consider all of the evidence,
including any evidence contrary to the verdict. Plas-Tex. Inc. v. U.S. Steel Corp., 772 S.W.2d 442,
445 (Tex. 1989). We must reverse on the basis of factual insufficiency if the court's finding is so
against the great weight and preponderance as to be manifestly unjust. Pool v. Ford Motor Co., 715
S.W.2d 629, 635 (Tex. 1986). Findings of fact are the exclusive province of the factfinder. 
Bellefonte Underwriters Ins. Co. v. Brown, 704 S.W.2d 742, 744 (Tex. 1986). This court is not a
factfinder and may not pass on the credibility of the witnesses or substitute its judgment for that of
the trier of fact, even if a different conclusion could be reached on the evidence. See Herbert v.
Herbert, 754 S.W.2d 141, 144 (Tex. 1988); Clancy v. Zale Corp., 705 S.W.2d 820, 826 (Tex.
App.-Dallas 1986, writ ref'd n.r.e.). When a party without the burden of proof on an issue
challenges the factual sufficiency of the evidence, the question is whether insufficient evidence
supports the complained-of finding. Gooch v. Am. Sling Co., 902 S.W.2d 181, 184 (Tex. App.-Fort
Worth 1995, no writ). An assertion that the evidence is "insufficient" to support a fact finding means
that the evidence supporting the finding is so weak or the evidence to the contrary is so
overwhelming that the finding should be set aside and a new trial ordered. Garza v. Alviar, 395
S.W.2d 821, 823 (Tex.1965). When a party challenges the factual sufficiency of the evidence on an
issue where that party has the burden of proof, the question is whether the factfinder's failure to make
a finding is against the great weight and preponderance of the evidence. Gooch, 902 S.W.2d at 184.

The Evidence

 James first called Gary to testify as an adverse witness. Gary stated that at the time of the
accident, he owned Sawdust Construction, a residential construction company. He employed James
as a "helper" to "get things and basically help us install the vinyl [siding] and things like that." 
James did the heavy work, carrying the vinyl siding and tools. On the day of the accident, he and
his crew had been installing vinyl siding on a house in Tyler. His crew consisted of himself,
Whiteside, Mario LeMontaine ("Mario"), James, Nick, James Goins, and Michael Robinson
("Robinson"). The crew drove to the job site in three separate trucks. Gary was driving one of the
trucks, and Nick and Gary's partner, Carl Underwood ("Underwood"), were driving the other two
trucks. Gary was also pulling a flatbed trailer that was loaded with equipment.

 At around 4:30 or 5:00 p.m., the crew left the job site. Underwood had left the job site earlier
in the day, so there were only two trucks available, both single-cab trucks, to carry the rest of the
crew home to Ore City, Texas. When the crew left, Mario and Whiteside were traveling in the cab
of the truck with Gary. Nick and James Goins, along with Robinson, occupied the cab of the other
truck. Gary further stated, "That left one person out without a seat, which was James and he opt[ed]
to ride in the back of my pickup." Both trucks were full, and there was no room in the cab of either
truck for another person to ride in. Gary testified that it was common in the construction industry
to sometimes have crew members ride in the cargo bed of the truck. 

 The cargo bed of Gary's truck had handrails along the top side of the bed. That day, the bed
contained an air compressor, an aluminum tool box mounted on the cargo bed, and empty vinyl
siding boxes "that had been folded and squashed flat." James was sitting on top of the folded boxes,
leaning against the front of the tool box, positioned "probably middle ways between the bed of that
truck and the top railing of that truck." He was not sitting up high above the side of the truck. In
his opinion, there was nothing unsafe or dangerous about James riding in the back of the truck. 

 Gary testified that on the day of the accident he was driving northbound in the left lane on
Highway 271 in front of Nick's truck. He had been driving in the left lane for a quarter to a half-mile before he reached the intersection where Goldberg's truck was located. The intersection was
an off-ramp access road off of Interstate 20, eastbound, that intersected with Highway 271. The
intersection of the eastbound access road and the southbound lanes of Highway 271 is controlled by
a stop sign. Vehicles are then able to cross the southbound lanes of Highway 271 to a road that
crosses the median between the northbound and southbound lanes of Highway 271. The intersection
of that eastbound median road and the northbound lanes of Highway 271 are controlled by a yield
sign. As Gary approached that intersection, he was traveling about 65 miles per hour, and saw
Goldberg's truck stopped at the stop sign. He then saw Goldberg drive through that intersection and
stop at the yield sign before the northbound lanes of Highway 271. 

 As Gary approached the intersection where Goldberg was stopped at the stop sign, he was
approximately 150 to 200 yards from the intersection. When Goldberg stopped at the yield sign, he
was "probably closer to 75, 50, 75 yards from him." Gary testified that he began to slow down as
he approached Goldberg because he "was not sure of his actions." He then saw the cab "move up,"
as if Goldberg had "come off that clutch" and released "the torque of that engine." When Gary
realized that Goldberg was "pulling out," he "jerked" his truck to the right. He then noticed that he
was traveling toward the bridge support columns, so he steered the truck back to the left to avoid
hitting Goldberg. 

 Gary believed that he would not have been able to use his brakes alone to avoid an accident
because he "would have probably hit him in the side in [Goldberg's truck's] fuel tanks." Gary also
stated that it was "just a matter of seconds" from the time Goldberg started pulling out to the time
he was able to control his truck. Gary then came to a stop about thirty or forty feet past that
intersecting road. After Gary came to a stop, Whiteside stated that James had "flew out." Gary
then exited his truck, ran to the middle of the highway, and pulled James to the shoulder of the road. 
James was "moaning, groaning of pain, he had blood all over him and road rash from one end of him
to the other." 

 While Gary was tending to James, Whiteside ran to the on-ramp of Interstate 20 to try to
catch Goldberg. An ambulance then arrived at the scene and transported James to the hospital. A
Texas Department of Public Safety office also arrived, and Gary discussed with him the events that
had just transpired. 

 On cross examination, Gary agreed that riding in the cab of a truck is safer than riding in the
bed of a truck, and that James would have been safer if he had ridden in the cab of his truck instead
of the cargo bed. Gary also agreed that James would not have been ejected from the truck if he had
not been riding in the bed. 

 Gary further testified that the distance between the top of the folded boxes James was riding
on and the bottom of the cargo bed was about twelve inches. Gary agreed with the assertion that
James would have been safer if he had been riding on the floor of the cargo bed instead of riding on
top of the boxes. However, Gary stated that the cargo bed was full, and that James did not have the
opportunity to sit anywhere else in the bed of the truck that would have been lower. 

 Whiteside testified by video deposition, and stated that on the afternoon of the accident, he,
Mario, and Gary were riding in Gary's truck, with James in the cargo bed, and that the Goins
brothers were riding in the truck behind them. He stated that James opted to ride in the back of the
truck because he, Gary, James, and Mario all lived in the same location, and the Goins brothers lived
at another location. He said that James was a big man, and that it would have been "tight" to try and
fit four people in the cab. Whiteside did not see any problem or danger with allowing an individual
to ride in the cargo bed. 

 Whiteside testified that Gary pulled into the left northbound lane on Highway 271 because
another eighteen wheeler was turning right onto the access road to Interstate 20. As the truck
Whiteside was traveling in approached the intersection where Goldberg was located, Whiteside
stated that he was "very aware" of Goldberg's location. He then noticed Goldberg's truck take
"three little bouncing lunges forward and at that point, you know, that alone had put him basically,
you know, halfway into our lane." When Whiteside saw this, he said that Goldberg was "coming
out." He was concerned that they were going to hit Goldberg's truck because it was "out in the
intersection." Gary swerved to the right, and then back to the left in order to avoid the concrete
bridge supports. Whiteside then became concerned for James's safety because he was sitting on top
of the folded boxes. Whiteside believed that the boxes were about six inches high at the time.

 Whiteside stated that after Gary turned to the left, he saw James eject over the passenger side
of the cargo bed, and land on his left shoulder. Whiteside got out and tried to catch up with
Goldberg, who ended up stopping in front of a service station. After he talked with Goldberg,
Whiteside went back to check on James.

 On cross examination, Whiteside testified that it was common practice for someone to ride
in the cargo bed of the truck when more than three persons were traveling in the same truck. 
Whiteside agreed with the assertion that riding in the cargo bed of a truck is not as safe as riding in
the cab of a truck. He also stated that there was room in the Goins brothers' truck because there
were only two people riding in that truck when the crew left Tyler.

 Whiteside testified that the vehicle he was riding in was 65 feet from Goldberg's truck when
he saw Goldberg drive into the left lane. He also stated that if his vehicle had kept going straight,
it would have hit the front passenger side of Goldberg's truck. 

 On redirect, Whiteside testified that James never had any difficulty staying in the bed of the
truck prior to Gary's evasive actions. He also stated that if Goldberg had not driven out into the left
lane, Gary would not have had to swerve to evade a collision. Whiteside said that if there were four
people riding in the cab of the truck, Gary would not have had the room to make the necessary
maneuvers to avoid Goldberg's truck. With regard to the passengers in the Goins's truck, he could
not recall whether Robinson had been in that truck. He knew that Robinson had been working with
them that day, but he could not recall whether Robinson was riding with the Goins brothers. 

 Randy Loftin ("Loftin"), a highway trooper with the Texas Department of Public Safety,
testified that he was the officer who investigated the August 19 accident. Referring to the accident
report Loftin compiled after the accident, he stated that in 1996, it was not illegal for a person to ride
in the back of a truck. (2) Loftin also testified that it was fairly common for persons to ride in the back
of pickup trucks. With regard to the cause of the accident, Loftin said that "the big truck pulled out
and the pickup swerved to avoid it, ejecting the occupant in the back of the pickup truck." He also
stated that Dicks had the right-of-way while traveling in the left northbound lane, and that Goldberg
was required to yield to northbound traffic on Highway 271. Loftin testified that the cause of the
accident was Goldberg's failure to yield the right-of-way to Gary's truck. At the time he investigated
the accident, Loftin did not place any fault or blame on Gary or James. 

 On cross examination, Loftin said that it was dangerous for a person to ride in the back of
a pickup truck and that James would have been safer if he had ridden in the cab of the truck. 
However, Loftin testified that he did not uncover any evidence that led him to believe that Goldberg
did not pull out in front of Gary's truck. 

 Goldberg also testified as an adverse witness, and said that he has been a truck driver for 33
years. Goldberg stated that on the day of the accident, his truck and trailer weighed between 50,000
and 60,000 pounds. When asked how a half-ton pickup with a trailer would have survived in a
collision with his truck, Goldberg replied, "He wouldn't fare too good." Goldberg also agreed that
if he were Gary, he would consider it reasonable and prudent to avoid a collision with his truck. He
further stated that he had never seen anything wrong with riding in the back of a truck, until the
legislature made it illegal. 

 On the day of the accident, Goldberg stated that he saw James riding in the back of Gary's
truck, and that James was sitting on top of a "high load." Goldberg said that the evasive actions
Gary described in his testimony were reasonable and prudent. Goldberg further testified that he had
waited at the intersection that ran into the northbound lanes of Highway 271 for about a minute to
a minute and a half, waiting on the other eighteen wheeler to make a right-hand turn. He said that
he moved his foot off the brake pedal and was going to put it on the accelerator and release the
clutch. Before he could do that, Gary's truck drove in front of him. However, the driver of the other
eighteen wheeler had already motioned to him to go across the northbound lanes of Highway 271,
so he started across. 

 Although he did not say so in his deposition, Goldberg testified that he looked south to check
for oncoming northbound traffic. When the driver of the other eighteen wheeler motioned for
Goldberg to cross, Gary "shot by right in front of" Goldberg. He said that he never saw Gary until
Gary's truck traveled in front of him. Goldberg agreed that it was his responsibility to look and
make sure there was no oncoming traffic, regardless of the angle of his truck in relation to the
oncoming traffic. He also agreed that the failure to look before crossing a highway is not a
reasonable and prudent action, and if a driver in his situation pulled out without looking, that would
not be a reasonable and prudent action either. Goldberg further stated that he was not aware of
anything that James did that caused or contributed to the accident. 

 On cross examination, Goldberg testified that after the driver of the eighteen wheeler
motioned for him to come through the intersection, he took his foot off of the brake, started to move
it toward the accelerator, and was going to release the clutch. Goldberg further testified that his
wheels did not move and that he saw Gary's truck travel straight in front of his truck, "just almost
right against [his] cab." He stated that his truck did not roll at all before Gary drove in front of him,
and that Gary's assertion that the wheels on his truck had turned was "just wrong." 

 Although Goldberg testified that it was possible that Gary and Whiteside saw his cab raise,
that did not indicate that his wheels were rolling. By the time Gary went past Goldberg, Goldberg
"was in motion, so [he] just put [his] foot on the accelerator and got on through the intersection and
went up to the top of the hill and stopped." He did not know that James had been ejected from
Gary's truck. 

 On redirect, Goldberg stated that he did not see Gary take any evasive action, but
acknowledged that "something had to happen to throw [James] out of the pickup." He further
testified that Gary "could have been reacting to a dog running across the road" or a "cheetah or lion,"
but agreed that there was no evidence of a dog or cheetah at the scene of the accident. After he saw
Gary's truck go by, Goldberg saw the truck driven by Nick apply its brakes to keep from hitting the
side of Goldberg's truck. Goldberg acknowledged that he did not see the second truck and that he
pulled out in front of it "because [he] was already in motion by then. There was no choice but to go
on." 

 Jill Dicks, James's wife, stated that she and James were married on February 14, 1991, and
that they had two boys. Before the accident, they all went on camping and fishing trips together, and
James and the boys would play basketball and football together. James would also help one of the
boys train for track meets. She testified that James had no physical difficulties or other health
problems before the accident, and that he had always been employed during their marriage. 

 After the accident, Jill went to East Texas Medical Center in Tyler, where James was
receiving care. She stated that James had a deep cut on his left hand that "went just about to the
bone" and that his left elbow, wrist, and his right elbow, as well as right upper arm, were injured. 
James had to receive special treatment to get the gravel out of his wounds, which were treated much
like burn injuries. The next morning, James was complaining of foot pain. The doctors then x-rayed
his foot, and found that he had broken it. 

 When James went home, Jill took care of his wounds. She had to remove the dressings from
his wounds three times a day, put James in the shower in a chair, and scrub the wounds with an
antibacterial solution. James could not walk at the time, so he used a wheelchair to get around. Jill
also had to put ointments on the wounds and re-dress them. 

 The wounds healed after about three months; however, Jill stated that James's skin is very
thin on his shoulders where the wounds were, and that he has to wear the strongest sunblock. If he
does not, then he will get blood blisters on his shoulders. James has to keep covered at all times or
he will get blood blisters from the sun and the heat. Jill said that James does not presently have any
problems with his foot.

 Jill testified that James had to have knee surgery in August of 1997. He progressed from
using a wheelchair to a walker, and then to crutches. About five weeks after the surgery, James's
treating physician released him to go back to work, but he was restricted from bending, stooping, or
climbing. James went back to work for three or four days, but when he came home from work on
those days, his knee was swollen and painful. After working those days, James could not go back
to work. 

 In April of 1997, James had an appointment with Dr. William Schreiber, one of his treating
physicians. Jill stated that a collection person for Dr. Schreiber was demanding payment before he
saw James again, and James missed that appointment because he could not afford to pay Dr.
Schreiber's bill. After working out a payment arrangement, Dr. Schreiber agreed to see James in
August. Dr. Schreiber examined James and released him, subject to the same restrictions. Dr.
Schreiber did not schedule any more appointments to see James after that visit. 

 Jill testified that after Dr. Schreiber released James, he looked for work but could not find
any that accommodated his restrictions. James finally found a job with Three D Janitorial Service,
the company Jill was working for at the time, in the summer of 1998. The two of them were not
making enough money, so Jill took another job in May of 1998, working the graveyard shift at Wal-Mart from 10:00 p.m. to 7:00 a.m. After four or five months of working two jobs, Jill stopped
because she was exhausted. She stated that James was pushing himself to work as much as six hours
a day at times, even though his knee was swelling. At some point thereafter, James had to quit
working six hours a day because his knees were swelling too badly. After a few months, James went
back to work at Three D Janitorial Service, and he has worked there since. 

 Based on the medical records and bills obtained from James's health care providers, Jill
testified that the total amount of James's medical expenses as a result of the accident was
$24,748.83. Jill also stated that the records did not include any charges for prescriptions or for the
medical supplies necessary to care for James's wounds, such as bandages and ointment. She did not
keep any records of those expenses, but estimated that when she bandaged him, it took anywhere
from five to six boxes at a time, at $5.00 to $6.00 per box. 

 On cross examination, Jill testified that at the time of trial, James's knee still hurt. Unless
James gets in the sun, the road rash scars do not hurt him. Jill also stated that James is the type of
person who will not go to the doctor unless she makes him go. She said that even though the knee
surgery was successful because James could walk, he is not the same man he was before the
accident. In light of Dr. Schreiber's restrictions, Jill testified that James is not able to perform his
job at Sawdust Construction. She also stated that by November of 1997, James had not looked into
any type of job training, but all he has ever done is manual labor. On redirect, Jill stated that there
is no additional treatment for James's scarring or to keep him from blistering when he gets in the
heat. 

 Dr. William Schreiber testified by video deposition, and stated that James was first seen by
one of his partners, Dr. Gary Goodfried, on September 4, 1996. Dr. Goodfried then referred James
to Dr. Schreiber, who saw James on September 11. Dr. Schreiber diagnosed James as suffering from
a complete tear of the anterior cruciate ligament and torn knee cartilage in his right knee. Dr.
Schreiber performed surgery on James on January 17, 1997 to repair the ligament and cartilage. In
February, Dr. Schreiber saw James again and remarked that James's knee was doing very well. On
February 24, Dr. Schreiber examined James's knee and told James that he could perform light duty
work, but he could not do any climbing. He examined James again on August 19, and noticed that
James had a bit of thickening of the soft tissue over the kneecap where the graft had been placed. 
He also noticed that James "probably formed a scar in reaction to healing the surgical wound"
because after that type of graft, a person cannot kneel on the front of the knee due to the pain. At
that point, Dr. Schreiber believed James could work, but not in a job that required frequent squatting,
kneeling, or climbing. At the time of his deposition on July 10, 2001, Dr. Schreiber had not
examined James since the August 19, 1997 exam. He also stated that he did not prescribe physical
therapy for James after the surgery because James "got the motion that [he] looked for." However,
Dr. Schreiber testified that if James had come back after three months, he would have prescribed
physical therapy for him. Because he did not go to any physical therapy, James can "have weakness
in his leg from having the injury," and if a patient does not work to get his strength back, "he [hasn't]
done everything he can to help himself." 

 Dr. Schreiber further testified that knee reconstruction surgery puts a knee back to a stable
position. However, that does not mean that the knee is returned to its prior condition. James lost
part of his knee cartilage, and sometimes people later develop arthritis after an anterior cruciate
ligament tear. Dr. Schreiber warned James that there was a risk he would develop arthritis after the
surgery. During their last visit, James told Dr. Schreiber that he was having trouble kneeling. Dr.
Schreiber said that this problem was common for the procedure he had undergone. 

 Dr. Schreiber stated that the pain may eventually go away because it takes about a year to
recover from this type of major injury. He did not criticize James for not returning after August of
1997 because he did not tell him to return. Based on what he saw the last time he examined James,
Dr. Schreiber believed that it would be painful for James to "squat and crawl and stoop. It would
be dangerous for him to be climbing on ladders and roofs." At the time he placed the restrictions
on James, Dr. Schreiber believed that James would build up his strength enough to use his legs on
a continuous basis. He did not place any permanent restrictions on James's work. 

 Dr. Schreiber was also asked about James's records from Dr. Thomas Taylor, an orthopedist
that James was referred to by the Texas Rehabilitation Commission. Dr. Taylor examined James
on December 28, 1999, and found that James had some looseness in the knee, as well as some
degenerative changes. This meant that he had arthritic changes in the knee, which can happen after
an anterior cruciate ligament tear. Dr. Schreiber stated that the arthritis is the result of the injury to
the knee, not the surgery. He also said that the delay in treatment did not cause any problem in
James's condition, and that the problems observed by Dr. Taylor are a progression of his condition. 
Dr. Schreiber testified that James would continue to have some swelling, pain, aching, and difficulty
in bending without pain. He also stated that this condition would be one that James is going to have
to live with, that the condition will likely worsen with time and aging, and that James would be even
more limited in the future. Because of the worsening condition, Dr. Schreiber testified that, based
on reasonable medical probability, James will need a total knee replacement at some point in the
future. Except for cycling, physical activities will be painful for James. 

 On redirect by Goldberg and Pacer's counsel, Dr. Schreiber stated that he believes James is
able to maintain full-time employment. Dr. Schreiber testified that everyone will probably
experience signs of arthritis later on in life. However, Dr. Schreiber could testify to a reasonable
medical probability that James's condition has worsened since he last saw him in August of 1997
because "thirty-four-year-old people don't usually have degenerative arthritis in their knee." In his
opinion, it is probable that James's arthritis is linked to the accident. He also agreed that persons
who have knee surgery may develop arthritis in that knee, which may warrant knee reconstruction. 
 Everett Dicks ("Everett"), James and Gary's father, stated that before the accident, James
helped him at his lawnmower repair business in order to earn extra money. He said that James was
not lazy or content just lying around and doing nothing. Before the accident, James played ball with
his kids, but could not do that after the accident. He said that James previously went fishing all of
the time, but had to quit fishing after the accident because he "can't walk up and down them creek
banks like he used to." Everett also stated that the accident has had a drastic effect on James's life
because "[i]t's changed his life the way he has to do things from what he used to do."

 On cross examination, Everett said that James would earn anywhere from $40 per week to
$100 per week while working at his lawnmower repair shop. He also said that James would
probably be able to go fishing if he wanted to because he was physically able to use a rod and reel. 
It just hurt James too much to climb up and down the banks when he went fishing for perch.

 Dr. Thomas Taylor, an orthopedist who also treated James, testified that James told him that
he was unable to kneel on his knee, had difficulty running, and his knee gave way occasionally,
which is not uncommon after the type of surgery James had. He stated that when he examined James
in December of 1999, he found "noticeable laxity" in James's knee. Dr. Taylor ordered x-rays of
James's knee, and found that the knee has some early degenerative changes, as well as "a little
squaring off of the joint, which can be consistent with a very early bone spur formation." He
testified that it is uncommon to see such a condition in a thirty-four year-old's knee, and that the
changes were probably attributable to his injury. Dr. Taylor examined James again on August 30,
2001, and his impression of James's knee was the same as it had been before. James's knee still had
a bit of laxity, but he was able to straighten his knee all the way out. 

 Dr. Taylor expressed his opinion that James does not have a normal knee because he has
some instability in it and has more arthritic changes in the knee than is normal for a person James's
age. Dr. Taylor believes that as the years go by, James will continue to have some difficulty with
his knee and will develop arthritis in the knee, a condition that is irreversible. Dr. Taylor thinks that
if a person with James's condition did a lot of stooping, climbing, and squatting, that would hasten
the development or the worsening of arthritis. He also stated that he thinks James will be a candidate
for a total knee replacement sometime in the future. After a total knee replacement, a patient needs
six weeks to regain his or her motion. The total range of motion is never recovered after such an
operation, but with any luck, the knee is better than one that has an advanced stage of arthritis. Dr.
Taylor said that he believed the restrictions Dr. Schreiber placed on James were reasonable and that
there was no reason to change those restrictions. Dr. Taylor stated that James's knee problem will
make it difficult to take part in leisure or recreational activities. 

 On cross examination, Dr. Taylor stated that rehabilitation following anterior cruciate
ligament surgery is important, but he did not know whether James had undergone any physical
therapy for his knee. In Dr. Taylor's opinion, a patient who does not exercise at all after such a
surgery will be more likely to have stiffness and some degree of laxity. Part of the laxity that he saw
in James's knee was attributable to James's failure to perform rehabilitation exercises after the
January 1997 surgery. Dr. Taylor stated that the degenerative changes in James's knee are consistent
with normal wear and tear, but that the changes are showing up a little earlier than usual in a normal
thirty-four-year-old person. Dr. Taylor could not say with absolute certainty that those degenerative
changes resulted from the accident. He could, however, state that his findings showed some very
early degenerative changes, but the changes had not worsened from the time Dr. Taylor first saw
James in December of 1999 to August of 2001. When Dr. Taylor last examined James, he did not
think that additional surgery was necessary at that point in time, but he thought that James was more
at risk than the average person to develop arthritis sooner. He also thought that it would be
speculative to pick a time in the future when James would possibly need a total knee replacement. 
 On redirect, Dr. Taylor testified that he did not have any information to believe that James
failed to follow any of Dr. Schreiber's instructions after the surgery that affected his recovery from
the injury. He also does not think it is likely that James would be having these problems if he had
not been injured in the first place. Dr. Taylor said that knee swelling in and of itself can cause pain
and that a lot of people with similar conditions state that their knee swells after standing. He also
testified that James's knee has not improved over time and is not likely to improve, but is more likely
to worsen over a period of time. 

 James testified next, and stated that he had worked as a manual laborer at a variety of jobs
for minimum wage for most of his life. He quit school in the ninth grade, and never obtained a GED. 
Before the accident, James was a healthy man, and had gone to the doctor one time after he cut his
foot. In his spare time, he, Jill, and their boys would fish or swim, go out in the yard, play football,
or basketball, and ride bicycles up and down the road. When he went fishing, he fished from the
bank. 

 On the day of the accident, James stated that he rode in the back of Gary's truck because
"there wasn't but two trucks left so there was three in one cab of the truck and three in the other cab,
and the only place to ride was in the back." He did not mind riding in the cargo bed of Gary's truck
because he had ridden back there on previous occasions when there were too many people in the cab
of the truck. When he was in the back of Gary's truck on the day of the accident, he was sitting on
a stack of three to five folded boxes, that stacked up "about maybe six or seven inches tall, twelve
inches, something like that." The crew did not put the boxes on the trailer that Gary was pulling
because the boxes would have blown out. James rode on top of the boxes in order to keep them from
blowing out. When asked if he had any other way to get home, James replied, "I could have called
somebody to come get me, but they probably wouldn't." He also stated that it was not possible for
him to ride in the cab of the truck with the other three persons because everyone would have been
crammed in, and Gary would not have been able to drive the truck. 

 As James was riding in the cargo bed, he was sitting in the middle of the passenger side of
the truck, facing toward the traffic behind them. His back was against the tool box that was mounted
to the bed of the truck toward the cab, and he was holding onto the siderail on his left. At some
point, James felt the truck "yank" or swerve, and "it kind of pulled [him] back over to the left and
that's when [he] flew out." There were two swerves that occurred "real fast," and it was the second
swerve that threw James out of the cargo bed of Gary's truck. Until the swerves occurred, James had
no trouble staying in the bed of the truck. After he was ejected from the cargo bed of the truck, all
James could remember was that he talked to an ambulance driver, and that he was "hurting real bad
all over." 

 Before Dr. Schreiber performed the surgery on James's knee, it "popped out" almost all of
the time. After the surgery, James said that his knee tries to pop out, "but most of the time [he]
catch[es] it." He testified that his left shoulder was also injured after the accident, and that the
shoulder still aches and wakes him up in the middle of the night. His road rash scars are very thin,
and if he gets out in the sun, blood blisters develop. James also has scars on his elbows, hand, and
stomach. The scars on his shoulders itch when they get hot, and when he scratches them, his
fingernails cut his skin. When he goes outside, he wears 45 sunblock and shirts that the sun cannot
penetrate. The knee surgery Dr. Schreiber performed made his knee better, but it still swells and
aches if he stays on his leg for a certain period of time. He also stated that Dr. Schreiber told him
to do leg lifts and knee bends, and that he did and continues to do those exercises. 

 James testified that he cannot work or play with his kids in the same manner as before the
accident. He wears a knee brace all day long every day to stabilize his knee. James said that after
the surgery, Dr. Schreiber told him not to bend, kneel, get on his knees, or climb ladders. He also
said Dr. Taylor told him that he would have to have a knee replacement at some point in the future. 
When Dr. Schreiber released him to go back to light duty work, James tried to work for Gary, taking
out trash and cleaning out dishwashers in repossessed trailer houses. He performed this job for a
couple of days, but the kneeling "got to [him] to where [he] couldn't do it so [he] had to quit." He
tried to find other jobs, but no one would hire him. At the time of trial, he was employed with Three
D Janitorial, a job he obtained in 1998. When he first started working, he was cleaning businesses
six or seven days a week. He was able to perform this job for a while, but he had to quit because his
knee started swelling. About two months later, he went back to work at Three D Janitorial Service,
but he worked fewer hours than he had before. When he works for Everett at the lawnmower repair
shop, James sits down while he works. With the physical restrictions James has now, he cannot do
the jobs that he did before the accident. 

 On cross examination, James testified that he probably would not have been ejected from the
truck had Gary not swerved to the left. He also had no idea if Goldberg had pulled out in front of
Gary's truck. James agreed with the assertion that riding in the cab of the pickup truck is safer than
riding in the cargo bed, and that he would not have been ejected had he been riding in the cab. He
further agreed that he would have been safer if he had been sitting on the floor of the cargo bed
instead of on top of the folded boxes. 

 James stated that he does not intend to seek any further medical treatment for the road rash
scars on his shoulders. He also does not have any future appointments for medical care. In James's
opinion, the surgery performed by Dr. Schreiber was not a complete success because "he didn't put
it back the way it was." James takes only aspirin for his pain and does not take any prescription pain
medication. When asked about his employment history, James testified that he did not work from
1997 to 1998 because he could not find any employer that would hire him with his physical
limitations. After James testified, his side rested. Gary then moved for a directed verdict,
contending that no evidence existed to prove his negligence on the day of the accident. The trial
court granted the motion.

 Goldberg and Pacer then began their case by recalling Goldberg to testify. Goldberg stated
that in his experience, when a truck with a trailer attached pulls to the right, the trailer will swerve
to the left. He questioned Gary's testimony because if Gary had swerved to the right as he said he
did, then Gary's trailer would have swerved to the left and hit Goldberg's truck. Therefore, in
Goldberg's opinion, Gary did not swerve to the right because the trailer Gary was pulling did not hit
the front of his truck. 

 On cross examination, Goldberg testified that he had no scientific basis for his opinion, and
that he did not see Gary swerve because he never saw Gary before he went by him. Goldberg rested,
and each side argued its case to the jury. When the jury returned, it found that James was not
negligent, and attributed one hundred percent of the cause of the accident to Goldberg. The jury also
awarded James $85,000.00 for past physical pain and mental anguish, $200,000.00 for future
physical pain and mental anguish, $42,000.00 for past lost earning capacity, $180,000.00 for future
lost earning capacity, $15,000.00 for past disfigurement, zero for future disfigurement, $15,000.00
for past physical impairment, zero for future physical impairment, $30,000.00 for past medical care,
and $40,000.00 for future medical care.

Contributory Negligence

 In their first issue, Goldberg and Pacer contend that the evidence is legally and factually
insufficient to support the jury's failure to find any contributory negligence on the part of James
Dicks. 

 Contributory negligence contemplates an injured person's failure to use ordinary care in
regard to his or her own safety. Kroger Co. v. Keng, 23 S.W.3d 347, 351 (Tex. 2000). This
affirmative defense requires proof that the plaintiff was negligent and that the plaintiff's negligence
proximately caused his or her injuries. Id. Because comparative responsibility involves measuring
the parties' comparative fault in causing the plaintiff's injuries, it necessitates a preliminary finding
that the plaintiff was in fact contributorily negligent. Id. At trial, the defendant bears the burden of
proof, by a preponderance of the evidence, on contributory negligence. Carney v. Roberts
Investment Co., Inc., 837 S.W. 2d 206, 208 (Tex. App-Tyler 1992, writ denied). In explaining the
concept of contributory negligence, the Texas Supreme Court in Parker v. Highland Park stated that 


 [t]here are many instances in which a person of ordinary prudence may prudently take a risk about
which he knows, or has been warned about, or that is open and obvious to him. His conduct under
those circumstances is a matter which bears upon his own contributory negligence. . . . One's conduct
after he is possessed of full knowledge, under the circumstances may be justified or deemed negligent
depending upon such things as the plaintiff's status, the nature of the structure, the urgency or lack of
it for attempting to reach a destination, the availability of an alternative, one's familiarity or lack of
it with the way, the degree and seriousness of the danger, the availability of aid from others. . . . Those
are matters which bear upon "the reasonableness of an actor's conduct in confronting a risk under
principles of contributory negligence."



Parker v. Highland Park, Inc., 565 S.W.2d 512, 520 (Tex. 1978). The court further stated that even
where a person has knowledge, actual or imputed, of a danger or condition, a question of fact is
presented unless it can be said, as a matter of law, that a person of ordinary care would not have
incurred the risk. Id. (citing McAfee v. Travis Gas Corp., 137 Tex. 314, 320, 153 S.W.2d 442, 447
(Tex. 1941)). On appeal, we review all of the evidence in the record that is relevant to the issue of
contributory negligence. Id. 

 Legal Sufficiency

 Goldberg and Pacer argue that riding in the bed of a truck is an open and obvious danger as
a matter of law; therefore, the fact that James was riding in the bed of Gary's truck proves that he
was contributorily negligent as a matter of law. To support this proposition, Goldberg and Pacer cite
Roland v. DaimlerChrysler Corp., a product liability case based on the manufacturer's failure to
warn of the danger posed by riding in the bed of an open truck. Roland v. DaimlerChrysler Corp.,
33 S.W.3d 468, 469 (Tex. App.-Austin 2000, pet. denied). In Roland, the plaintiff was injured after
being ejected from the back of a truck that was manufactured by DaimlerChrysler. The trial court
granted summary judgment to DaimlerChrysler on the basis that it owed no duty to Roland to warn
of any hazards of riding in the back of a truck because such an action is an open and obvious danger
as a matter of law. Id. at 469-70. In affirming the trial court's grant of summary judgment, the court
stated that 


 [in an affidavit, an expert for Roland contends that] Texans continue to ride in the back of trucks
because it is a "Texas way of life." This, however, does not tend to show that Texans are ignorant of
the risks involved. This evidence neither supports nor undermines their conclusion. People often do
dangerous things for reasons we may not understand, while fully appreciating the risks involved. Its
open nature and the lack of restraining devices in the bed of a pickup truck make it immediately
apparent to the ordinary and reasonable observer that the potential for ejection exists for anyone riding
there. We firmly believe that people have a sufficient intuitive grasp of the basic laws of physics to
ensure that if one is in an open and unprotected area of a truck, the consequences of a sudden start,
stop, or turn are understood and appreciated as a matter of common knowledge.



Id. at 470. Goldberg and Pacer also cite this court's opinion in Arkansas Freightways, Inc. d/b/a
American Freightways v. Price, for the proposition that James's riding in the back of Gary's truck
constitutes contributory negligence as a matter of law. In Price, James Allen Price ("Price") was
riding in the trunk of a vehicle that was hit by an Arkansas Freightways truck. Arkansas
Freightways, Inc. d/b/a American Freightways v. Price, No. 12-97-00353-CV, slip op. at 12 (Tex.
App.-Tyler 1999, pet. denied) (not designated for publication). Price was severely hurt in the
accident, and sued Arkansas Freightways for his injuries. Following a jury verdict in his favor,
Arkansas Freightways appealed, contending, inter alia, that the jury's finding that Price was not
negligent was against the great weight and preponderance of the evidence. We agreed with Arkansas
Freightways, and reversed the trial court's judgment because Price's position in the trunk was a
substantial factor in producing his injuries. We also held that "[i]t is common knowledge that car
trunks are not designed to be occupied by passengers." Id.

 The instant case is markedly different from Roland and Price. Roland was a products case
based on the manufacturer's failure to warn of open and obvious dangers. Price was riding in the
portion of a vehicle that was not designed to be occupied by passengers at any time. Here, James
sued Goldberg and Pacer because of Goldberg's failure to act as a reasonably prudent person; he did
not sue the manufacturer of Gary's truck because it failed to warn him of the dangers of riding in the
back of a truck. Moreover, unlike Price, the evidence in the instant case showed that a person riding
in the back of a pickup truck is a common occurrence. 

 The case of Kerby v. Abilene Christian College is similar to the case at hand. In Kerby, a
school bus struck a linen delivery truck, which caused the driver of the delivery truck to be ejected
through the sliding door of the truck that had been left open. Kerby v. Abilene Christian College,
503 S.W.2d 526, 527 (Tex. 1974). Much like the instant case, the defendant in Kerby argued that
the driver was contributorily negligent because he was driving with his door open. Id. The court
of appeals reversed the trial court's judgment negating any finding of contributory negligence on the
part of the plaintiff. In reversing the court of appeals, the supreme court held as follows:


 We draw a sharp distinction between the negligence contributing to the accident and negligence
contributing to the damages sustained. Contributory negligence must have the causal connection with
the accident that but for the conduct the accident would not have happened. Negligence that merely
increases or adds to the extent of the loss or injury occasioned by another's negligence is not such
contributory negligence as will defeat recovery. 



Id. at 528. 

 Most of the witnesses who testified at trial, including Goldberg and Trooper Loftin,
acknowledged that it was common for a person to ride in the back of a pickup truck. No law existed
at the time of the accident, nor does it exist today, that forbids adults from riding in the back of a
pickup truck. Although James acknowledged that riding in the back of Gary's truck was dangerous,
but for the conduct of Goldberg, the accident would not have happened. We cannot say that James's
act of riding in the back of Gary's truck was contributory negligence as a matter of law. Therefore,
the evidence is legally sufficient to support the jury's finding that James was not contributorily
negligent.

 Factual Sufficiency

 Even though witnesses who were asked testified that it was common to ride in the cargo bed
of the truck, those witnesses also acknowledged that it was safer to ride in the cab of the truck. On
the day of the accident, James and Gary testified that James could not have ridden in the cab of either
truck because there was no room for him. Only Whiteside testified that there may have been room
for James to ride in the other truck. James testified that he had ridden in the back of Gary's truck
on numerous prior occasions and had experienced no trouble when doing so. James was sitting
down in the bed of the truck, holding onto the siderail. He also stated that it was necessary for him
to ride in the back of the truck in order to hold down the boxes and keep them from flying out of the
truck. James testified that he had no problems remaining in the bed of Gary's truck until Gary took
the evasive action to avoid a collision with Goldberg's truck. He also stated that had he been in the
cab of the truck, Gary would not have had room to perform the evasive action necessary to avoid the
collision with Goldberg's truck. 

 When the jury is presented with conflicting evidence, it may choose to believe one witness
and disbelieve others, or it may resolve inconsistencies in the testimony of any witnesses. St. Louis
S.W. Ry. Co. v. King, 817 S.W.2d 760, 762 (Tex. App.-Texarkana 1991, no writ). As the trier of
fact, the jury is the sole judge of the credibility of the witnesses and the weight to be attached to their
testimony. Id. Although the jury could have determined that James was contributorily negligent
because he understood the dangers of riding in the back of Gary's truck, there is also evidence
supporting the jury's failure to find contributory negligence and that Goldberg was one hundred
percent negligent. Id. Considering all of the evidence, we cannot conclude that the jury's failure
to find James negligent is against the great weight and preponderance of the evidence. Accordingly,
Goldberg and Pacer's first issue is overruled.

Foreseeability

 In their second issue, Goldberg and Pacer argue that the evidence is legally and factually
insufficient to establish that James's ejection out of the cargo bed of Gary's truck was the foreseeable
result of any conduct by Goldberg. Foreseeability requires that the actor, as a person of ordinary
intelligence, would have anticipated the danger that his negligent act created for others. Doe v. Boys
Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 478 (Tex. 1995). Foreseeability does not require
a person to foresee the particular accident or injury that, in fact, occurs. Nixon v. Mr. Property
Mgmt. Co., 690 S.W.2d 546, 550-51 (Tex.1985). Foreseeability requires only that (1) the injury be
of such a general character as might reasonably have been anticipated, and (2) the injured party be
so similarly situated in relation to the wrongful act that the injury to her or to someone similarly
situated might reasonably have been foreseen. Id. (citing Carey v. Pure Distrib. Corp., 133 Tex. 31,
124 S.W.2d 847, 849 (1939)). The question of foreseeability asks whether the injury might
reasonably have been contemplated as a result of the defendant's conduct. Doe, 907 S.W.2d at 478.
 Goldberg and Pacer admit that the swerving of Gary's truck was a foreseeable response to
Goldberg's actions. However, they contend that it could not have been reasonably foreseen that the
conduct of its driver at this intersection would lead to James's ejection and subsequent injuries. Gary testified that he saw Goldberg's truck "raise up" and "come on out in front of" him. 
Whiteside also saw Goldberg's truck pulling out from the yield sign and yelled, "It's coming out!" 
The evidence supporting the jury's finding that Goldberg was negligent demonstrates that Goldberg
failed to yield the right-of-way to Gary's truck on the day of the accident. Because Goldberg failed
to yield the right-of-way, Gary had to take evasive action. Although the exact sequence of events,
namely James being ejected out of the back of Gary's truck, may not have been foreseeable by
Goldberg, the general danger of someone being injured as a result of Goldberg's failure to yield the
right-of-way was foreseeable. See Military Highway Water Supply Corp. v. Morin, 114 S.W.3d
728, 738 (Tex. App.-Corpus Christi 2003, no pet.). 

 After considering only the probative evidence and inferences supporting the jury's finding,
and disregarding all evidence and inferences to the contrary, we hold that more than a scintilla of
evidence exists to support the jury's finding of foreseeability. We also conclude that the jury's
finding of foreseeability is not against the great weight and preponderance of the evidence. 
Accordingly, Goldberg and Pacer's second issue is overruled.

Future Mental Anguish and Physical Pain

 Goldberg and Pacer argue in their third issue that the evidence is legally and factually
insufficient to support the jury's award of future mental anguish and physical pain. We disagree.

 Matters of past and future physical pain, mental anguish, and physical impairment are
particularly within the jury's province when determining an award of damages. Marvelli v. Alston,
100 S.W.3d 460, 482 (Tex. App.-Fort Worth 2003, pet. denied). By definition, future mental
anguish has not yet occurred, and, therefore, is speculative and based on probabilities. Southwestern
Bell Telephone Co. v. Garza, 58 S.W.3d 214, 236 (Tex. App.-Corpus Christi 2001, pet. granted). 
Damages for future mental anguish are recoverable "if there is a reasonable probability that they will
be suffered in the future." Lubbock County v. Strube, 953 S.W.2d 847, 857 (Tex. App.-Austin
1997, pet. denied); Hicks v. Ricardo, 834 S.W.2d 587, 590 (Tex. App.-Houston [1st Dist.] 1992,
no writ). Future mental anguish is measured by the same standard as past mental anguish and may
not be awarded without either "direct evidence of the nature, duration, or severity of [plaintiff's]
anguish, thus establishing a substantial disruption in the plaintiff's daily routine," or other evidence
of "'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation,
embarrassment, or anger.'" Saenz v. Fidelity & Guar. Ins. Underwriters, 925 S.W.2d 607, 614
(Tex. 1996). Likewise, damages to be awarded for physical pain in the future are necessarily
speculative, and it is peculiarly within the province of the jury to set the amount of such damages. 
Strahan v. Davis, 872 S.W.2d 828, 834 (Tex. App.-Waco 1994, writ denied). There must be some
objective evidence that an injury will continue to adversely affect the party claiming such damages. 
Id. 

 Gary testified that before the accident, James played ball with his and other kids at family
holidays, and that James had no physical impairments that prevented him from performing these
activities. He also stated that James was a hard worker. Since the accident, Gary stated that James
"can't do it," meaning that he "just can't participate" in the family gatherings because his knee is too
painful. After James got hurt, the doctor released him to light-duty work. James could not stay up
on his leg for very long, so Gary created a job in which James cleaned mobile homes after Gary and
his crew performed work on them. James tried this work for about two days and could not stand the
pain from stooping and squatting. 

 Whiteside stated that when he went back to check on James after James had been ejected,
James was "skinned up from head to toe." He also said that when James came back to work with
them after the accident, James had difficulty staying on his feet for extended periods of time. 

 Jill stated that the skin on James's shoulders is very thin where the wounds were, and that
he has to wear the strongest sunblock. If he does not, he will get blood blisters on his shoulders. 
James has to keep covered at all times or he will get blood blisters from the sun and the heat. Jill
said that James does not presently have any problems with his foot.

 Dr. Schreiber testified that knee reconstruction surgery puts a knee back to a stable position,
but does not restore a knee to a completely normal condition. James lost part of his knee cartilage,
and sometimes people later develop arthritis after an anterior cruciate ligament tear. Dr. Schreiber
warned James that there is a risk that he will develop arthritis after the surgery. He testified that
James will continue to have some swelling, pain, aching, and difficulty in bending without pain. He
also stated that this condition will be one that James is going to have to live with, and will likely
worsen with time and aging. According to Dr. Schreiber, James will be even more limited in the
future. Because of the worsening condition, Dr. Schreiber testified that, based on reasonable medical
probability, James will need a total knee replacement at some point in the future. Dr. Schreiber
could testify to a reasonable medical probability that James's condition has worsened since he last
saw him in August of 1997 because "thirty-four-year-old people don't usually have degenerative
arthritis in their knee." In his opinion, it is probable that James's arthritis is linked to the accident.

 Dr. Taylor also believes that James will continue to have some difficulty with his knee and
will develop arthritis in the knee, a condition that is irreversible. Dr. Taylor thinks that if a person
in James's condition did much stooping, climbing and squatting, the development or the worsening
of arthritis would be hastened. He also stated that he thinks James will be a candidate for a total
knee replacement sometime in the future.

 James testified that he is still in pain from the accident and that he cannot take part in the
same activities he used to, especially with his boys. He also stated that his injuries limit the jobs he
can do because he cannot stay on his leg for extended periods of time.

 Because there is more than a scintilla of evidence that James's condition will worsen over
time and that he will require a total knee replacement in the future, we hold that the evidence is
legally sufficient to support the jury's award of future mental anguish and physical pain. We also
hold, after reviewing all of the evidence, that the jury's award is not against the great weight and
preponderance of the evidence. Therefore, Goldberg and Pacer's third issue is overruled.

Past Medical Expenses 

 In their fourth and final issue, Goldberg and Pacer argue that the evidence is legally and
factually insufficient to support the award of $30,000.00 for past medical expenses because the
evidence adduced at trial demonstrates that the total amount of medical expenses James incurred is
$24,748.83. We agree. 

 A claim for medical expenses must be supported by evidence that such expenses were
reasonably necessary for the plaintiff to incur as a result of the injuries suffered. See Rodriguez-Narrea v. Ridinger, 19 S.W.3d 531, 532 (Tex. App.-Fort Worth 2000, no pet.) (citing Six Flags
Over Texas, Inc. v. Parker, 759 S.W.2d 758, 760 (Tex. App.-Fort Worth 1988, no writ)). Proof of
amounts charged or paid is not proof of reasonableness. Id. In addition, evidence that medical
expenses are reasonable and customary is no evidence those medical expenses were reasonably
necessary. Rivas v. Garibay, 974 S.W.2d 93, 96 (Tex. App.-San Antonio 1998, pet. denied). A
plaintiff may prove medical expenses are reasonable and necessary either by presenting expert
testimony, or by submitting affidavits in compliance with section 18.001 of the Texas Civil Practice
and Remedies Code. See Tex. Civ. Prac. & Rem. Code Ann. § 18.001 (Vernon 2003); Rodriguez-Narrea, 19 S.W.3d at 532. 

 In the instant case, the only evidence of James's reasonable and necessary medical expenses
was a summary of the medical expenses provided to James by affidavit from his medical providers. 
That summary showed that the total amount of James's medical expenses is $24,748.83. Therefore,
the evidence is legally and factually insufficient to support the jury's award of $5,251.17 more than
the amount that was proved to be reasonable and necessary. Accordingly, Goldberg and Pacer's
fourth issue is sustained. 


Conclusion


 We hold that the evidence is legally and factually sufficient to support the jury's findings that
Goldberg's negligence proximately caused the accident and that James was not contributorily
negligent. The evidence is also legally and factually sufficient to support the jury's award of future
mental anguish and physical pain. However, the evidence is legally and factually insufficient to
support the jury's award of $5,251.17 more than the amount that was proved to be reasonable and
necessary. Accordingly, we modify the judgment of the trial court to reduce the damage award for
past medical expenses from $30,000.00 to $24,748.83. See Picon Transp., Inc. v. Pomerantz, 814
S.W.2d 489, 491 (Tex. App.-Dallas 1991, writ denied). 

 As modified, the judgment of the trial court is affirmed.


 DIANE DEVASTO 

 Justice



Opinion delivered February 11, 2004.

Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.

















(PUBLISH)
1. The total damage award was $607,000.00 plus $285,372.80 in prejudgment interest; therefore, James's
total recovery was $892,372.80.
2. Loftin also stated that the law has changed, and that "[y]ou can't ride in the back of a pickup truck at all
unless it's your main source of transportation." But see Tex. Transp. Code Ann. § 545.414 (Vernon 2003) (a
person commits an offense if the person operates an open-bed pickup truck or an open flatbed truck or draws an open
flatbed trailer when a child younger than 18 years of age is occupying the bed of the truck or trailer).